Bertram Harnett, J.
Special contingency commission agreements between insurance carriers and their producers based on favorable underwriting experience are commonly known in the insurance industry, but judicial construction of their terms is rare.' This is one such case.
Plaintiff insurance broker Rudolph E. Bucci, Inc. (Bucci), wrote policies of liability and workmen’s compensation insurance for the defendant carrier, Greater New York Mutual Insurance Co., during the period 1961 to April, 1964. On Sep *466 tember 18, 1962, they entered into a “ Special Contingency Commission Agreement ” which, in effect, gave Bucci as additional commissions a sharing interest in the profitability of his account.
The agreement provided: ‘ ‘ The rate of contingent commission will be computed as of June 30, 1963 and annually thereafter each June 30 and v. ill be based on the ratio of the Losses Incurred to Earned Premiums (herein referred to as the Loss Ratio) for the period ending June 30, 1963 and thereafter each twelve (12) month period ending June 30 (herein referred to as the contingent period.) ”.
“Loss Ratio” is to be determined from: “(1) Earned Premium — fifty (50%) percent of the Net Premiums Written * * * during the current contingent period plus fifty (50%) percent of the.Net Premiums Written during the last previous contingent period.
“(2) Losses Incurred * * * (a) Loss payments * * * during the contingent period, plus (b) Loss Reserves Outstanding as of June 30 of the current contingent period, less (c) Loss Reserves Outstanding as of June 30 of the previous contingent period ”.
A contingent commission rate table in the agreement indicates an ascending rate of commissions from 0-10% where the loss ratio falls below 50%.
In equational summary, the formula appears as follows:
rate
Losses Incurred table
(a) -= Loss Ratio-Commission rate.
Earned Premiums
(b) Commission rate X premiums written = contingent commission.
It was conceded during the trial that the “ Earned Premium ” for the contingent period July 1, 1962 to June 30, 1963 (“first period ”) was $101,101 and for the contingent period July 1, 1963 to June 30, 1964 (“ second period”) was $106,376.
The broker, however, disputes the carrier’s computations in two essential respects. First, he claims that losses incurred should have been considered only on policies written during the same contingency period. The carrier computed losses incurred by adding losses actually paid during the year to the closing reserve, and subtracting the open reserve, without regard to time of particular policy origination. Second, the broker claims that a loss reserve credit for a large workmen’s compensation claim set up in the first contingency period should be debited *467 in that same first period because in a subsequent period it was determined the claim was not to be paid. The carrier, in fact, credited the reserve in the year of the claim and later debited it for an offsetting sum in the year lack of liability was determined.
The carrier’s treatment of loss ratio appears correct to this court for two reasons. First, the plain language of the agreement excludes time of policy writing as a factor in loss identification and justifies the carrier’s method. Second, the sense of the arrangement is that the broker is to share in profits on his account and profits should be determined in accordance with established accounting methods.
In the first contingency period, the carrier entered a reserve for $37,624 on account of a workmen’s compensation death claim. The file was closed in July of 1965, during the three years following the second contingent period, without the carrier being required to pay anything. In effect then, this sum, when posted as a reserve, detracted from the favorability of the loss ratio in the first contingency period. However, it was debited and therefore restored in the final accounting following the second period. Unfortunately for the broker, it came in during a period when his loss ratio was so unfavorable that it did not help him then. However, as set forth above, the agreement is plain in its meaning in the computation of loss ratio.
Under both the broker’s contentions he must be defeated by the sense of the arrangement. For accounting purposes, businesses operate in accordance with standardized accounting methods. The determination of profits must follow a recognized reporting system. To enable recognition of gain or loss in a fiscal period, there must be a closing time, although entries in subsequent periods may affect net adjustments in the long run. There may be carry backs or carry forwards, or tax refunds, but the essential accounting integrity of each reporting period is fundamental. Otherwise, a statement is never final; it is always subject to revision, with the concomitant difficulties. Indeed, the agreement itself specifically provides under certain circumstances, in a manner inapplicable here, for a limited carry forward of excessive loss ratio. The testimony in the case was that established claim accounting practice required a reserve posting when a claim is made, and a subsequent entry when the claim is liquidated. (See, Tunick and Saxe, Fundamental Accounting Theory and Practice [2d ed.], pp. 437-438.)
The broker as plaintiff bears the burden of proof. (Friedman v. Metropolitan Life Ins. Co., 250 App. Div. 195.) No *468 showing has been made by him of impropriety or unreasonableness in the carrier’s accounting procedures or methods.
During the second period, the affiliation between the broker and the carrier was terminated. The contingency commission agreement provides that in such event: ‘‘ no Contingent Commission will be computed, nor Contingent Commission considered named or due, until three years after the date of termination. All premiums earned and losses incurred after date of termination but arising out of policies in force as of the termination date will be included in the final accounting period of the contingent commission
Accordingly, the second period for computation of contingency commissions did not end on June 30, 1964, as claimed by Bucci, but on June 30, 1967, the end of the accounting period three years after the date of termination. It was uncontroverted that the broker wrote net premiums of $96,636.76 during that period. Following the formula set forth in the agreement, the earned premium, computed as 50% of the net premium for the first period plus 50% of the net premium for the period July 1, 1963 to June 30, 1967, was $106,192.30. During the latter period, the losses incurred, including reserve adjustments, were $54,968.43. The loss ratio for that period is then 51.3% and the agreement provides in such event that no contingency commission is due for that period.
However, a numerical error does appear, requiring some recovery for the broker for the first contingency period. The testimony and the company records reveal that the loss incurred for the first period was in fact $47,432. Applying the formula included in the agreement, the loss ratio for that period, the ratio of $47,432 (loss incurred) to $101,101 (earned premium) was 46.9%. According to the table in the contingency commission agreement, this entitles the broker to an additional commission of 1.24% of the written premium for that period. Accordingly, there is due to Bucci for the first period a contingency commission of $1,435.07, of which $1,041.73 has already been paid, leaving a balance due of $393.34.
Accordingly, the clerk may enter judgment in favor of plaintiff in the sum of $393.34, with interest from June 30, 1963, together with the costs and disbursements of this action.